Mr. Landau Thank you, Mr. Chief Justice, and may it please the Court. This case turns on the straightforward point that the people of Puerto Rico are the source of authority for the laws of Puerto Rico. That means that a prior Federal conviction has no double jeopardy implications for the enforcement of the Commonwealth's criminal laws, because Commonwealth law and Federal law emanate from different sources of authority — the people of Puerto Rico on the one hand, and Congress on the other. Justice Sotomayor Mr. Landau, could Congress amend 48 U.S.C. 1704, which covers Guam, the Virgin Islands, America, and Samoa? Could it amend that statute and put Puerto Rico in there as well? Landau It could certainly amend that statute, Your Honor, with respect to Federal prosecutions in Puerto Rico pursuant to its authority over Federal prosecutors. Your question, Your Honor, raises a very intricate question with the point that Justice Sotomayor In the statute, it works both ways. Landau In the statute, Your Honor, it does, because there's no question. Puerto Rico is in a unique status that is different than Guam, the Virgin Islands, and America, and Samoa, precisely because those are all territories governed as traditionally by organic acts of Congress. Sotomayor But is there any other? Kennedy What about the Northern Marianas? Landau Your Honor, they are in an interesting position that is generally more analogous to Puerto Rico in the sense that they are a commonwealth of the Northern Marianas with a compact of their own that was very much modeled on Puerto Rico, although it's somewhat different than the Puerto Rico model. But there's a profound distinction that goes to the heart of this case between the home-ruled territories where Congress, to be sure, has delegated a measure of self-government to those particular territories, but each of them, Guam, the Virgin Islands, and America, and Samoa, are still governed by organic acts of Congress, as was Puerto Rico prior to 1915. Ginsburg Mr. Landau, could you finish your answer to my question? You said yes as far as what the Federal Congress can do with what the Federal prosecutors do, but the statute works both ways. Are you saying it couldn't, Congress has no power to do that with respect to Puerto Rico? Landau I would say, Your Honor, that that raises a very interesting and tricky issue with respect to the compact that the 1950 Public Law 600 offered the people of Puerto Rico that was accepted. As this Court said in the Flores de Otero case in the 1970s, the Congress'---- Sotomayor Well, I think the answer is probably not insofar as this Court said, and I'm not saying this myself, I'm quoting this Court, Congress relinquished control over the organization of the internal affairs of the island. Now, one point to make very, very clear, our position today on the double jeopardy issue does not turn on that relinquishment issue. But to answer your hypothetical specifically, if Congress started to tell the Puerto Rico prosecutors what cases they may prosecute, that might raise some serious questions under the compact. Ginsburg I just take the statute as it is, just add Puerto Rico. Landau Right. Ginsburg Not telling prosecutors what to do in a particular case. Landau Well, and again, Your Honor, I think the critical point here, and I think what is most telling, going back to some of the colloquy that just happened in the other case, Congress since 1952 has never attempted to do anything like that, to tell the people, to exercise control over what the government officials in Puerto Rico do. Scalia That doesn't mean it couldn't. Landau That doesn't necessarily. Scalia That doesn't mean it couldn't change the law. Is it essential to your case that we recognize Puerto Rico as a sovereign? Landau It is not essential that you recognize Puerto Rico as a sovereign with a capital S, because if you get 12 political states. Scalia It's a mutual double jeopardy law, isn't it? Landau It is the shorthand. Scalia Two sovereigns, it's a different matter. Landau It is the shorthand that this Court has typically used, the dual sovereignty doctrine. But the Court made clear, this is the lesson of the Wheeler case, where the Court was the Ninth Circuit said, gee, these Indian tribes don't look like sovereigns to us because they are subject to the plenary control of Congress. That's not what we typically think of as sovereigns. And this Court says, you're missing the point, Ninth Circuit. What we mean in the context of double jeopardy, the language we are construing is the same offense. Laws create – offenses created by two different entities are not the same offense if they flow from different sources of authority. Kagan Well, I don't understand how that helps you, Mr. Landau. You're saying that the test is what the source of authority is, and you're saying that the source of authority here is the Puerto Rican people. Landau Correct. Kagan But that seems to be just – you're not taking another step back. What's the source of authority of the Puerto Rican people? The source of authority of the Puerto Rican people was a congressional act. If you go back, the ultimate source of authority is Congress. Landau That, Your Honor, is the crux of the case, and with all respect, I disagree with the suggestion that the ultimate source here is Congress. Congress could be – what Your Honor just described is very much like a home-ruled jurisdiction, where let's say you have the Virgin Islands Legislature that passes a Virgin Islands law, but that government of the Virgin Islands is itself a creature of Congress, as was the government of the Philippines in the early 1900s and Puerto Rico in the 30s at the time of the Shell case. What made all the difference in the world, Your Honor, was that in 1950 to 1952, Congress said we recognize and fully endorse the government – the concept of government by consent. So we are not delegating authority to the people of Puerto Rico. Kagan But would Congress today, if it felt like it, and of course it won't, but if it felt like it, could Congress go back on that decision? Landau Well, this then goes to the relinquishment issue, Your Honor, in terms of what is the nature of the compact. This has been a very emotional and hot-button issue in Puerto Rico. As Chief Judge Magruder noted in his article in 1953 already, there was divergent views at the time from the very outset on whether Congress could do that.  Well, if you lose the existing compact, do you then lose your case? Landau Absolutely not, Your Honor. And that is why. Kennedy And why? Landau Because this is, again, the lesson of Wheeler. It was uncontested in Wheeler that plenary congressional control over the Indians – over the Indian tribes meant that Congress could abrogate Indian sovereign immunity with the stroke of a pen and even abrogate the tribes and derecognize the tribes. But that didn't mean that the existing tribal laws at the time were not considered the laws of a separate tribe. Kennedy Are there – sovereignty is a slippery word. That's why the Framers didn't use it in the Constitution. Are you suggesting there's kind of a second-class sovereignty and a first-class sovereignty? Landau Well, Your Honor, I couldn't agree more with your insight that sovereignty is a slippery word. And if you've got 12 political philosophers, they would all give you a different answer as to what sovereignty means. And I think that is precisely why Wheeler said we can't have judges and courts trying to decide double jeopardy questions by asking abstract questions of sovereignty, because, you know, even the State's sovereignty is different than the sovereignty of independent nations. They don't have ambassadors, et cetera. So what this Court has made clear is the test in the double jeopardy context is all about the source of authority for the laws. And going back to Justice Kagan's question, which I think cuts to the heart of the case, in this particular case, Congress said we – and this is pursuant to demands for – by the people of Puerto Rico for government by consent. The people of Puerto Rico said we are tired of being a colony. We want to create our own government. And so the Constitution of Puerto Rico could not be more explicit on this score that it says the political power of the commonwealth emanates from the people. That document was submitted to the Puerto Rico voters. So you are a Puerto Rico voter. You see this is what I'm voting for. It was submitted to the President of the United States and Congress, who approved that particular understanding. Ginsburg. Mr. Landau, Mr. Landau, we have a situation as a result of the decision of the Supreme Court of Puerto Rico. I think it was two of the justices who said we are not going to get into this business about the Constitution. We think, interpreting our own double jeopardy provision, somebody should not be tried a second time. So that's going to be the law of Puerto Rico. That's – if the Puerto Rico Supreme Court said that, then we would have the situation that led us to grant cert in this case. That is, if you have a prosecution first in the federal government, then Puerto Rico will not have a second prosecution. You have it first in Puerto Rico, federal government is free to institute a second  That's it. You are absolutely right, Your Honor. And that was the position of two of the nine justices on the Supreme Court of Puerto Rico. That position did not command a majority, which is why there is no adequate and independent state ground here. The majority was very explicit. But they could. They could. If the majority – we told the majority you are wrong, nothing would prevent them from agreeing with those two justices. No. That's absolutely right. And about 21 states – There's no way you could break that situation of having – it depends on which jurisdiction goes first. That's correct, Your Honor. And that is true in about 21 states that as a matter of State law, either statutory or constitutional, do not allow a subsequent prosecution. But again, that doesn't change the point. What made the cert grant appropriate and intolerable was that the Federal – was the difference between the Federal and State courts in Puerto Rico on the Federal constitutional question. It would not be a split if one were Federal and one were State. Mr. Landau, there is something you said that resonates with me, because I have been trying to find a definition of sovereignty. And one has been created in the briefing by saying that States are sovereign. Yet if you look at international usage, they wouldn't consider States necessarily sovereign, because they can't order their foreign affairs, they can't print money, they can't do lots of things that others would consider them sovereign for. So I guess the Constitution does something else with that word. What is it – what are the elements of sovereignty with respect to the Double Jeopardy Clause that you think are commanded by our case law? There's more than just the Puerto Rican people say. Absolutely. And it can't be that it's the compact alone. So what is it? What are the principles that you meet that would create sovereignty in the Double Jeopardy sense? To take your question in turn, Your Honor, this Court has made it clear in a series of cases, starting in Wheeler in 1978, that really tries to synthesize what the Court has been saying with respect to the dual sovereignty doctrine for over a century. And what the Court said is in the Double Jeopardy context, we are trying to decide whether two offenses from different entities are the same offense. That has traditionally been called dual sovereignty. But what we mean by dual sovereignty in this context doesn't require this broader – let's say I'll call it Sovereignty with a capital S inquiry. It is a much more targeted and narrow inquiry into is the source of authority for each offense. Now, I'm looking at Lanza, and it says – I think Lanza says, and it's a dual Double Jeopardy clause, that for Double Jeopardy clause purposes, sovereignty means, one, that the separate entity possesses the authority to determine what shall be an offense against their peace and dignity. Two, can enact laws without the interference of the other. And three, draws authorities to punish the offender, and this is the one that you've been arguing, from a distinct source of power from the other sovereign. And you keep saying it's the Constitution, it's the we, the people. It sounds a bit histrionic to me. There's something else. What is it? By this distinct source of power. If I could just make two quick points in response to that. First, Lanza is not the last word on this, because Wheeler, in the 70s, clarified what Lanza meant, because, for instance, the Ninth Circuit in Wheeler said, well, the Indian tribes don't fit the Lanza definition because Congress has plenary authority to overrule at any time. So that goes to the first part of your question. To the second part of your question, it is Congress acting in tandem with the people of Puerto Rico that's critical. In other words, it is certainly not the people of Puerto Rico that could unilaterally and without reference to Congress just say, guess what, we are the source of authority of our own laws, and that would be the end of the story. Ginsburg. I thought that in the case of the Indian tribes, what the Court said is they were one sovereign before we got here, and we took some of that sovereignty away. That's not the case with Puerto Rico. Yes. We are certainly not saying that we are absolutely on all fours with the Indian tribes. There are what Your Honor said is true, although one thing to keep in mind, of course, is that not all tribes preceded the creation of the United States. In fact, if Congress can recognize Indian tribes to this day, the standard is under 25 CFR 83.7, and an entity that existed as recently as 1900 can still be considered an Indian tribe. But the rationale was that the tribes had this sovereignty, and that's what was being respected. That is correct, Your Honor. The tribes had an inherent sovereignty, but I think the point for double jeopardy purposes doesn't require the inherency. It just requires a recognition by Congress of an exercise of sovereignty, and that goes back to what is it? That is, look, if we simply write an opinion and it says Puerto Rico is sovereign, that has enormous implications. It does. The insular cases are totally changed in their application. Right. The political implications I'll just stay away from. On the other hand, if we write an opinion that says it's just a territory, that has tremendous implications. Correct. How did we tell the U.N. it wasn't a colony? Why are we not reporting on this colony every year? Correct. Either way, between those two, the implications in law and in politics and in everything else are overwhelming. Therefore, you argue a third and middle position. Your position, pointing to four cases in this Court, so you have very good authority, is for double jeopardy purposes there is a different question. The question is what are the sources of the law? And I find four cases that say just what you say. Okay? Now, you say the sources of law, the sources of criminal law here are different. Okay. What I think Justice Sotomayor wanted you to say is explain that. Yes. Take a little time, if you like. In what way are they different? Absolutely, Your Honor. They are different, Your Honor, because Congress invited, in Public Law 600, Congress said we recognize the principle of government by consent. That is something that we as Congress recognize. Sotomayor, I'm getting back to the political issues, and that's what I think Justice Breyer is trying to stay away from. This is a very simple question. Okay. All right? Can the Federal Government override a Puerto Rican law? Your Honor, this goes to the Federal Government. Can they veto a Puerto Rican law? No, absolutely not. They cannot. Who makes these laws? The people of Puerto Rico, the legislative assembly, the legislative powers of which were vested by the people of Puerto Rico in the legislative assembly. In other words, the Puerto Rico Constitution could not be more specific in saying we, the people of Puerto Rico, in the exercise of our nature. The laws are made by Puerto Rico's comparable countries. That is correct, Your Honor. And this is the point I'd really like to underscore, because I think it's critical here, is this arrangement was not something that Puerto Rico did as a rogue usurpation of authority. This was pursuant to the invitation of Congress and with the blessing of Congress. That was submitted to the Congress. The Congress saw that way. But even in saying that, Mr. Landau, you're putting Congress in the driver's seat here. It was done at the invitation of Congress. Congress approved it. Presumably Congress can unapprove it if Congress ever wished to. So if Congress is in the driver's seat, why isn't Congress the source of authority for the purposes of our double jeopardy jurisprudence, which seems to make that the issue? I mean, you could imagine a different double jeopardy jurisprudence where the issue was who just exercises authority in the real world. But that seems not to be what we ask. That's correct. That's correct. And I think that the key point that I would like to make, Your Honor, is that you have to look at Congress has plenary authority over the territories under the territorial clause. Our position is that Congress is not the prisoner of its plenary authority. It is the master of its plenary authority. And therefore, when Congress can decide that for the long-term future of Puerto Rico, it does not think that it is appropriate or good for Puerto Rico or the United States to have direct or delegated Federal power in Puerto Rico. It says we accede to the request of the Puerto Rican people to create their own government and to be the source of authority of their own law. So that's what Congress invites. The people of Puerto Rico accept the invitation. They enact a constitution that is entirely explicit, saying the political power of the Commonwealth creates the structure, creates a legislative authority, vests the courts of Puerto Rico with judicial authority. Kennedy, let's call this theory of yours interim sovereignty. Are there any examples in international law of interim sovereignty? Are there any examples in international law or in the United States' experience of a dichotomy such as you suggest? I just don't know the answer to that. I think that, in a sense, the danger of that is that's already going back to asking about concepts of sovereignty. And I think the more one asks those more abstract questions, it gets away from what is a much simpler question, which is — I think this goes back to Justice Sotomayor's question, which is what is — we have before us here, this is a specific case or controversy. Nobody is asking the Court to make a broad political statement. All we want to know is may Puerto Rico, may the Commonwealth prosecutors prosecute these particular Puerto Rico Commonwealth gun charges and ammunition charges, okay? The source of authority for these particular laws is the legislature of Puerto Rico. The legislature of Puerto Rico has delegated power from Congress. That's what distinguishes this from municipalities. I'm sorry. Roberts, why does the Commonwealth of Puerto Rico have that authority? Where did it come from? Congress can recognize and invite an exercise of sovereignty, just like this Court recognized in Lara. But it had complete authority under the Territorial Clause whether to do that or not, right? That's correct. And that is exactly the case. It's not authorizing Puerto Rico to adopt a constitution of its own. But this — you just said authorizing. I think the key point is it invited Puerto Rico, and what it did is the constitution that Puerto Rico adopted and that Congress then accepted specifically says political power emanates from the people. So, Your Honor, I think that's the point. Why is — I mean, you seem to fix on invited as somehow different than authorized. Well, even if you said — I guess the point is authorized sounds like a delegation of authority. I think the point is Congress said, look, you go adopt your own constitution. That in and of itself doesn't necessarily answer the question of where the authority from that constitution comes from. But again, when it says fully recognizing the principle of government by consent, this is what the people of Puerto Rico wanted. They wanted to create their own government. They didn't want to have another organic act. Aren't there territorial legislatures? There are indeed, Your Honor. What's the difference? I mean, why can't you say the laws that they enact have as their source the people of the territory? You could, and in fact, that was the tradition in the 19th century. We cited a number of cases. Of course, there weren't a lot of these kind of cases in the 19th century because the Federal government had very, very limited criminal powers. So these come up in things like counterfeiting money and selling liquor to the Indians. But so we cited them. May I just ask you a question about that? I don't quite understand, because this whole issue is the result of a 5-4 decision of this Court in the 1950s, right? Barkas. So talking about cases before that, there was no issue before that. Well, Your Honor, certainly the principle of dual sovereignty had been recognized by this Court as early as the 1840s. In other words, that two offenses for double jeopardy purposes were not the same if they were created by different entities was something that this Court had recognized, albeit in dignity. Recognized how? I mean, because this was a very close case, as you know. Absolutely. Absolutely. So I don't think it was settled before then. Well, but it was something that was continued to be an issue that has divided people in the Court. In the more recent cases since the 1950s, it has not been a particularly divisive issue. And just to be clear, in this case, there is no call by the other side to overrule the Court. No, I'm just questioning you're looking back before the Barkas case to foreprecedent. Right. Well, Barkas didn't come out of the blue, Your Honor. Barkas has antecedents. Lanza was the first case in 1922 when prohibition is what really suddenly had Federal criminal laws that were quite widespread throughout the country. And Lanza is, I think, the first case you can characterize as a square holding of this case on the dual sovereignty doctrine. It continued to be a somewhat controversial doctrine up until the 1950s, and then it's been, I think, settled since then. And it's not been challenged in this case. Scalia, I'm not sure you answered my question about why territorial legislatures are different. They are different because those, the other ones, are home rule legislatures. In other words, there is a Virgin Islands Organic Act. There is a Guam Organic Act. So Congress created and a D.C. Home Rule Act. Congress created that government structure and endowed it with authority. Pursuant to what Congress did, the people have a certain degree of autonomy. They elect their legislatures. D.C. has D.C. laws. The Virgin Islands has Virgin Islands law. You know, to some extent or other, those can be vetoed maybe by Congress. Scalia, if you say that the issue is the source of the law in question, it seems to me that the territorial legislature is as much the source of a law as is the legislature of Puerto Rico. The question, Your Honor, is the ultimate source of authority for the law. So when you have a home rule jurisdiction, again, this is — I'm not saying this. This is what this Court has held, that when you have a home rule jurisdiction — this is the Waller case, for instance, where it's a municipality — it's clearly the city council was the source of the law. But the ultimate source of the law was delegated power from the State. The critical point here is that the Commonwealth of Puerto Rico, the legislative assembly of Puerto Rico — this goes back to Justice Sotomayor's point and Justice Kagan's point — is not exercising power delegated to Congress. Kennedy. I see your time is getting up. It seems to me that in a way, if you answer Justice Scalia's question, well, yes, it is true that local legislature is the source of the law, and there is double jeopardy there, too. Yes. Well, you — again, that would be another way of looking at the issue, and that, frankly, was the historical way of looking at it. If you go back to the 1850s cases, they said territories, which at that time were creatures of Congress, that was considered to be a separate sovereign for double jeopardy. That's the historical antecedent. But in the 20th century, particularly in Wheeler and the more recent cases, the Court has said the question is the ultimate source of authority. The ultimate source of authority for the laws of Puerto Rico, unlike the ultimate source of authority for the laws of the Virgin Islands, is the people of Puerto Rico, not Congress. I'd like to reserve the balance of my time. Roberts. Thank you, counsel. Mr. Unikowsky. Mr. Chief Justice, and may it please the Court. Under our Constitution, States are sovereign and territories are not. Although Puerto Rico has indisputably achieved a historic degree of autonomy, it remains a territory under Article IV. As such, it cannot be considered sovereign for double jeopardy purposes. An unbroken line of this Court's double jeopardy cases has stated, both before and after the enactment of the 1952 Constitution of Puerto Rico, that territories are not sovereign for double jeopardy purposes. It does seem, Mr. Unikowsky, as if Congress has given Puerto Rico as much authority as it possibly could have, short of making it a State itself. Do you disagree with that? Well, two responses. One, yes, I disagree with that, and two, even if I agreed with that, we do think that there is a sharp dividing line between States and territories for constitutional purposes. What kind of territory is it? It is a — we think that there is only one type of territory. There is. The Insular Cases have at least two. Well, yes. The Insular Cases did hold that it is considered an unincorporated territory. That is true. Okay. So it's that kind. Yes. Now, what is an Estado Libre Associado? Your Honor, I believe that's a case that just construed a Federal statute to hold No, no. I just wonder, as it appears in the Constitution of Puerto Rico, as the alternative of the word Commonwealth. Well, Your Honor, we believe that the Constitution does not include that as a constitutional category, just as it doesn't. Where does it say in the Constitution that Congress cannot? After all, Congress can't admit a State. It says that specifically. It certainly does. It talks about territories. So you are saying Congress and the President, too, do not have the authority to associate with some other entity under the form of Estado Libre Associado? That is correct, Your Honor. Where does it say that in any of our cases? Well, I think the Yankton case very clearly says that if a portion of land is not in a State, then it has to be under a territory. And what are the Indians? Your Honor, the Indian tribes are a sui generis category explicitly recognized in the Constitutional Dutch. Because we do not recognize explicitly in the Constitution Commonwealth, therefore there is no Commonwealth. Is that what you want us to say? I want you to say that this Court has already held in the Harris case that Puerto Rico is a territory, and not only that, but some purposes. But the issue here is, I see it, which maybe it will take a second, is there are four cases that say we don't have to reach these grand questions. All we have to do is decide what the source of power is. Now, their argument is that even if you go back to the 4-Acre Act, which indeed did have the people of Puerto Rico making laws, and if you then add the Resolution 600, which delegated the authority to make the Constitution, the Constitution itself, which speaks of we, the people of Puerto Rico, making a law, the fact that later Congress and the President said Puerto Rico has a Republican form of government, the fact that subsequent to that, we went to the United Nations and had them withdraw the requirement to report on a colony, because Puerto Rico is not a colony, and you know the words as well as I, and they sure sound like sovereign. And in Valle, which no one mentions, Trias Mongay wrote that, in fact, all these laws, and he was talking about civil, but I suppose it applies to Commonwealth as well, too, are to be interpreted in light of the civil code tradition of Europe, which was the tradition that applied prior to 1900 and not the common law. I don't see, when you put all those things together, if you're looking at the facts of what the law of Puerto Rico is in the area, it sounds to me like it's civil code coming out of a Constitution which, I grant you, was given by authority of Congress. So there we are. Now, there's five things they've listed there that make it different, not only from anything you can think of, but from anything I can think of. So why don't you reply to those five things, if you want? Fisherman, Your Honor, those five things established Scalia, Take your time. I think those features of Puerto Rico and others establish that Puerto Rico has undoubtedly achieved a significant degree of autonomy, but those characteristics are not the characteristics that matter for sovereignty purposes or for double-jeopardy purposes. The question is the ultimate source of power, and here the ultimate source of power is Congress, which delegated the authority to enact the Puerto Rican Constitution. And I'd also point out that if one looks at the characteristics of sovereignty as defined in the Constitution and this Court's cases, Puerto Rico doesn't have them. For instance, in the Alden case, as this Court explained, one of the reasons we call States sovereign is that one cannot frame their general police power as the delegation of Federal power, because the Federal government doesn't have a general police power in the States, so there's nothing to delegate. That's just not true in Puerto Rico. Sotomayor, but that was not true of many of the territories that were admitted as States. They came into Statehood and were conferred by a – the sovereignty was conferred by an agreement with the Federal government. And States were admitted by agreement, and sovereignty were confirmed on them by agreement. And so are you telling me that if, let's say, one of the islands in the Caribbean – I'll make one up, okay – Atlantis has been never kicked out its foreign colonial status 200 years ago, but it really doesn't have many resources, and it comes to the United States and it says, I want a treaty, you'll take care of all of our external affairs, we'll follow whatever you say with respect to external affairs, we're even going to use the American dollar because it's convenient, but you can't touch our internal affairs, and Congress approves that treaty. Would that, for double-derivative purposes, not be a sovereign? I think it wouldn't be a sovereign if that was not part of the United States, not subject to Federal law. I couldn't hear, would or wouldn't? It wouldn't. So, for instance, we can see that Micronesia and Palau, which are now independent countries, I believe in the United Nations, are genuinely sovereign, even though there are defense agreements with the United States. Because the United States has foreign allies with whom they have many treaties and relationships, and those foreign allies may be sovereign. But those aren't territories. They're not – the American flag doesn't fly over them. They're not subject to plenary power of Congress and Federal law. That's the distinction in Puerto Rico, which is indisputably a territory under Article  Sotomayor, but if Congress has that treaty power, why doesn't it have similar power under its rule and regulation clause of the Constitution? There's no limiting principle of what rules and regulations Congress can make. Well, let me refer, Your Honor, both to the Constitutional clause. There's no suggestion of how or even what kinds of treaties, perhaps not in violation of the Constitution, but what kinds of treaties Congress can make, and it makes an awful large number of them. It does, Your Honor, but let me refer to both the constitutional text and structure as the basis of our argument. Beginning with the text, Article IV characterizes territories as, quote, And we believe that is antithetical to the concept of sovereignty. Congress does have the ultimate power to enact a wide variety of governmental forms in the territories, but the sine qua non of a territory is that, in fact, Congress does possess that power. And I'd also refer to the constitutional structure. The framers of our Constitution split the atom of sovereignty between the Federal Government and the States, and I think that presupposes that the question of what Mr. Yanukovsky, it sure seems as though in the early 1950s, Congress, with respect to Puerto Rico, said we want to give it some sovereign authority. We want to give it an enormous amount of home rule authority, basically everything. And we also have some idea in our heads that Puerto Rico ought to be a sovereign. With all the things that sovereigns have, like a Constitution and a We the People Clause, and why isn't that something? It's an unusual idea, to be sure, a sovereign territory. But Congress seems to have wanted to do exactly that. Well, I'd first push back on your premise. I don't think that's what Congress wanted to do. I think that the history, the legislative history and the events, the historical record, show that Congress wanted to delegate autonomy, which is different from creating a sovereign. So first, I'd turn to the issue of Section 20, in which Congress just unceremoniously stripped a portion of the Puerto Rican Constitution and permanently barred Puerto Ricans from enacting it, reenacting it. That is not consistent with what I think we ordinarily consider a sovereign. And I'd also point to the legislative history and record. I mean, there's testimony from the Secretary of the Interior, from the resident commissioner of Puerto Rico, from the governor of Puerto Rico, in the House report, in the Senate report. All of that seemed to contemplate that the political status of Puerto Rico wouldn't change, and this was just a delegation. I mean, there was actually a hearing, we quote on page 30 of our brief, where the chairman of the relevant Senate committee basically tells everybody that, in fact, Congress's powers over Puerto Rico wouldn't be altered at all, that ultimately this was a delegation of power, but one that was revoked and wouldn't change Congress's ultimate power over Puerto Rico. So I actually think that it's Petitioner's position that really is fundamentally inconsistent with the historical record as it existed at the time. We don't dispute that there's this is historic legislation. I mean, it's true. Petitioner's brief characterizes the 1950 to 1952 legislation as, quote, path-marking, and we actually agree with that. It was path-marking. It was historic legislation that delegated a significant amount of power to the people of Puerto Rico, and it was very historically important and remains important today. But there is a difference, a meaningful constitutional difference between the delegation of power and the conferral of sovereignty. The former occurred in Puerto Rico as it has occurred in other territories. The latter can only apply to States within our union. Kennedy, is our argument so abstract that it doesn't acknowledge real practicalities of multiple prosecutions? Of course, Mr. Landau couldn't come up and say, please forget Heath and Wheeler and Walter and Grafton. Let's do something other than sovereignty. Has there been any suggestion by commentators and so forth that this whole inquiry of sovereignty and source of power is a little bit misplaced? Of course, you have the problem with the cities within a separate one State, which it seems ought to be subject to a single rule. But have there been any common commentaries that lead us to another approach altogether? I don't think we're going to overrule four cases. I would acknowledge that there have been some law review articles suggesting that this whole line of cases is wrong and the Court should look to something else, to autonomy. But certainly this Court's cases going back a century haven't followed that approach at all. And I actually think the municipality example is a very good one for us, because cities regularly enact home rule charters through a very similar type of democratic process that Petitioner describes for Puerto Rico. The fundamental principle of Petitioner's position here is that the enactment of a charter of local self-government, setting forth the parameters for local self-government, in and of itself leads to sovereignty. That's how they distinguish the Shell case. But if that's true, there's no limiting principle, because municipalities do that all the time. I didn't fully understand the case.            Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. No, Your Honor, it could not. We think that the Constitution prohibits that, and Congress's exercise of its powers was fully consistent with that Constitutional requirement. Sotomayor. I'm sorry. You're saying to me that Congress can't make Puerto Rico independent? Of course it could, Your Honor. So if it can do that, why can't it have other arrangements with Puerto Rico the way it has with everybody else? Why are we saying that with respect to territories they don't have that power? Your Honor, I think that if Congress, if Puerto Rico is to remain a territory, which it is under Article IV, as this Court has held, then Congress must retain the ultimate power. I think that falls from the Constitutional structure in which the Framers contemplated splitting the Atomic Shots. Breyer. That's a big issue. I mean, we told the U.N. This doesn't sound like we said it was a municipality. Your Honor. The U.N. said that Puerto Rico has been invested with the attributes of political sovereignty, which clearly identify the status of self-government attained by the Puerto Rican people. We said this is the U.N.? This is what we told the U.N. We told the U.N. that, and on the basis of that. Who is we? It's what it says here is it consists of the President of the United States. The President said that? Or his delegate. His delegate. He may be involved counsel in the stuff. I have you've read the same thing. There are about ten words such as republic, not a colony, attributes of political sovereignty, repeated in five or six key documents. I do, not everyone does, happen to think that what we tell the U.N. to get it removed from the colony's status bears some consideration. I grant you not everyone agrees with that. But that's my view of it. All right? And I guess I, I, I, I, I, all right, forget it.  Roberts, we don't see any inconsistency between what the State Department said and our position today. You said it was like a municipality. I just think that having the attributes of political sovereignty and being a republic and saying that the Constitution of Puerto Rico is the basic document, whatever the language was there, don't sound like a municipality. Your Honor, there are differences between a municipality and Puerto Rico, such as Puerto Rico has a much more delegated power than the typical municipality. That is undoubtedly true. But the, there's no. Sotomayor, that doesn't have meaning. In most municipalities, their offenses are treated as criminal offenses and not criminal infractions. They can only pass laws with respect to a very limited amount of issues. The States have control over many, many other things. They're substantially different. Why would we have bothered talking about the structure of Florida's system with municipalities in Waller? We went through how the State controlled all of the internal, most of the internal affairs of municipalities, and we said they're not separate sovereigns because of this control. All we could have said is what you want us to say now, which is municipalities' ultimate source is the State government. But we did something very different in that case. May I answer? Roberts, briefly? Yes, Your Honor. I think that already as of Shell, Puerto Rico already enjoyed that broad police power. That's why Petitioner's argument turns entirely on the existence of the Constitution of Puerto Rico. And our point is that the act of Constitution-making we don't think can confer sovereignty. Thank you. Roberts, thank you. Roberts, thank you. Mr. Harsky. Mr. Chief Justice, and may it please the Court, I think to respond to some of the questions that have come up, I'd like to go back and address what the Court has said this test is for dual sovereignty in the double jeopardy context and why it's been using that test. And the test that the Court has consistently used for the past 100 years is by looking to the ultimate source of the authority, the laws for prosecuting and the authority to prosecute. And the reason that the Court has said that it's looked to that ultimate source is because the dual sovereignty doctrine rests on the basic structure of our Federal system. That's what the Court said in Wheeler. And the Court has been very careful to guard who is a sovereign under the Constitution and who is not, because after all, we're talking about a weighty power here, which is the ability of two sovereigns to prosecute a person for an offense with the same elements. So if you trace the history of what this Court has done, it started with Lanza and Grafton. Lanza was a case about the Federal Government as opposed to the States, and the Court said should they have this power to dual prosecute, well, we look to the Constitution and the unique structure that was put in place, the splitting the atom of sovereignty. And we are in a circumstance where both the States and the Federal Government have this sovereign power. They should both be able to prosecute. But then the case the Court turned to cases about the territories, which was the Shell case about Puerto Rico, but then also the Grafton case about the Philippines, and it said no, the territories derive their ultimate power from Congress. That's true by virtue of the territory clause. Now, one thing that the Court has considered in the course of those cases as they've evolved, I think, is the suggestion that Justice Kennedy made, which is maybe we should focus on something else like autonomy and the ability to prosecute. And what it looks like practically are on the ground. And the Court has consistently rejected a test along those lines, and I think that we have three data points for that. Sotomayor, they haven't eschewed that. In all of those cases, Grafton and all of the ones pre-1952, the Court pointed to the fact that when these islands passed laws, they could be vetoed by Congress or were that was the Organic Act. In all of these places, Congress was appointing their legislature in part, or they were appointing colonial governors. And we went through in each one of them very carefully what the issues of control that remained that didn't make them sovereign in any way, that made them classic territories. So it's not that we didn't – that we eschewed looking at that. I don't think that's right, and I'd like to just look at the specific example of Puerto Rico that the Court considered in the Shell case. As you say, by that point, Puerto Rico, or as you suggested, there had already been significant self-government in Puerto Rico. There were two houses of the legislature elected, and the Court, when asking this question about whether there could be both Puerto Rico antitrust offenses and Federal antitrust offenses, went through the situation in Puerto Rico and said, there is significant self-government in here now. It defined Puerto Rico as having an autonomy similar to that of the States. That's in 1937, and said that Congress had given it a sweeping grant of legislative authority. But the Court nonetheless said that under our constitutional system, as a territory of the United States subject to Congress's authority, that Puerto Rico was not a separate sovereign. Sotomayor, but you forget that Congress could veto those laws. Before 1952, Congress could veto Puerto Rico's laws. It has relinquished that right. I don't think that that's right. I don't think that that's right, and to the extent the Petitioner suggests it, it's just not consistent with the territory clause of the Constitution, which, after all, gives plenary power to Congress. Breyer, this is very interesting, what you're saying. Remember, though, one of the provisions of the Puerto Rico Constitution, which Congress approved and said it was a Republican form of government, is that criminal actions shall be conducted in the name and by the authority of the people of Puerto Rico. Now, that sounds like a delegation of authority as to source to go back to the Spanish system if they want. Now, if I take your view, then I guess you have to say, and it has considerable implication, that that doesn't matter because Congress can take back what they gave. Now, is that the position of the government or the executive branch? Because that has tremendous implication. Because obviously there is an argument as to whether what Congress and the President gave in Resolution 600, followed by the Constitution, followed by what happened at the U.N., under the authority and looking to Felix Frankfurter for guidance, who said that the Constitution provides us with many forms of possible relationship. That's what his view was. And now is the position of the executive branch. I mean, do you want to take a position on this, that Congress, if it wishes, can take all that back? And Puerto Rico has no more independence than, in principle, than any of the other places that were territories. Now, that's a big question. But you see it's an important question. And I want to know if the government's position rests upon it, because that's an important statement for the executive, in my opinion. Well, two responses to that question. The first, I think, is the first part of your question. This statement in the Puerto Rico Constitution that the authority to prosecute comes from the people of Puerto Rico and that it's in the name of the people of Puerto Rico, that's been true since 1900. That was in the 1900 Organic Act. That was true in 1917. Puerto Rico is not claiming that it was a sovereign then. So I would not rely on that. But the second and obviously more weighty question that you raised is the question of could Congress revise the arrangements it has with Puerto Rico. And we think the answer is yes, and that that follows from the structure of the Constitution and its history. I want to explain why that's why. But first, I think it's very important for us to say that Congress's position towards Puerto Rico, starting in 1900 through 1917 with the elected legislature — elected legislators, 1947, the elected governor, and then this Act in 1950, has been one of increasing self-government, recognizing the benefits of that to the people of Puerto Rico. That's why Congress authorized the enactment of the Constitution. We think that that's a good thing. We have no reason to believe that Congress would revisit that. We think it's had many benefits for the people of Puerto Rico and the United States. But asking the constitutional question, which is what the Court has asked in its double-jeopardy cases about whether Congress could revise the arrangement with Puerto Rico, the answer is yes. And we think that that follows from its status as a United States territory because of two parts of the territory clause. The first is that territories belong to the United States, meaning that they are under the sovereignty of the United States. And then second, that Congress is the one who makes the rules. And if I could just make one more point, which is historically, the fact that Congress was — that the United States was the sovereign and the only sovereign in the territories was very important at the time that the Constitution was put together. You may recall that the United States had land there through the Northwest Ordinance, that it was trying to figure out what to do with, and there were questions with the States, what would happen, and so that this provision needed to be added to the Constitution to make clear that Congress was the one who was going to make rules for the territories and that it would be under the sovereignty of the United States. And when this was the case, and there are some things, let's go back to the Insular cases right there. There are different kinds of territories. It's because of that that Frankfurter says that the Constitution has left the field of invention open. The decisions in the Insular cases mean this, if they mean anything, that there is nothing in the Constitution to hamper the responsibility of Congress in working out arrangements. Now, if that's so, why couldn't Congress delegate, without the power to take it back, the authority to Puerto Rico to work out its own criminal code subject to the constraints of the Bill of Rights, et cetera? Why couldn't it? I mean, if Frankfurter is right, or do you take the opposite position, that it couldn't? Well, I think the Insular cases were talking about something different and narrower, which is whether all the protection of the Bill of Rights apply to the territories by their own force. But to answer the broader question that you answered or asked, we think that it's inconsistent with the grant of authority to Congress in the Constitution for a territory to be a territory, but no longer be sovereign, because the Territory Clause defines territories of the United States as subject to the authority of the United States. Kagan, so you think it's not possible, Ms. Zaharsky, I mean, putting aside whether for Congress to confer sovereignty in the sense that would matter for the Double Jeopardy Clause? Well, it certainly could by making it a State. Yes. Or by making it independent. But not short of that. We think that that would just be fundamentally inconsistent with the constitutional design. And if I could just maybe give the last part of my historical answer, because I think it's very important, is when this provision was put into the Constitution, it was coupled with the New States Clause, and it was understood that the options for sovereignty were statehood. It was not that if this was a territory, that the territory was controlled by the United States. And I think it would have been very surprising to the States and the constitutional conventions to think that when States were defined as such important things in the Constitution, sharing the sovereignty with the United States, that Congress could somehow create a sovereign territory. We just don't think that's correct. Could Congress also say, could it not, that in its criminal code, that if a crime has been prosecuted and under Puerto Rican law, it will not be the same, the same crime will not be prosecuted under Federal law? Would it say that if it wanted to? I think there are two different options. Congress can define what crimes are and whether they are crimes in Puerto Rico as opposed to somewhere else. So if that's what you're suggesting, yes, I think that's what Congress could do. What we don't think that Congress could do is change the meaning of the Fifth Amendment and the Double Jeopardy Clause, because that's something for this Court. Scalia, Well, no, certainly Congress cannot deny double jeopardy effect to something that would be double jeopardy. But I'm talking about a statute that says even though it might have double jeopardy effect, we say no. Well, right, and what I'm saying is I think Congress's ability is to define crimes and to set out what they are and where they are, but if the question is what the Fifth Amendment permits, Congress just says we will, the Justice Department will not prosecute a crime that has already been prosecuted in Puerto Rico. Right? And the Justice Department can work with Puerto Rico to decide who will prosecute what crimes. In fact, we do that as a general matter so that there's usually not any overlap of the kind that occurred in this case. But I think that's just a very different thing from suggesting that Puerto Rico is a sovereign under the Double Jeopardy Clause. Scalia, No, I understand that. I'm just saying that if you like that result, it can be done by a statute. I'm sorry if I misunderstood the question. I'm just trying to be extra careful because. I'm trying to be helpful. I know. I know. I do understand that now. I just want to make sure that I'm being clear because I think this case does raise a lot of important questions, and I do think that this Court's jurisprudence over the past 100 years has been very careful about what it means to be a double jeopardy sovereign. Ginsburg, could you explain before you sit down when and why the United States changed its position on this question? Because as I understand it, it in more than one brief took the position that Puerto Rico for double jeopardy cases, for the Double Jeopardy Clause is treated like a state. That's right. The government took that position in two courts of appeals and defended it in a brief in opposition to this Court, where we also said the issue didn't matter. But since that time, we have revisited this issue, given substantial attention to it both within the Department of Justice and within many agencies of the Federal Government, and our position as set out in our brief is that it is not a separate sovereign, and we think that that's entirely consistent with the other things that we've learned and testimony that DOJ and others have given to Congress about Puerto Rico's current status and its options for the future. The end of our brief talks about the task force that the President has put in place that has issued reports three times over the past decade and a half, which has said this is the constitutional status Puerto Rico has now. To the extent that people of Puerto Rico want to change it, here are the options that are consistent with the Constitution. Tell us what you want, and then Congress will decide where to go from there. So I would not want to suggest that as a result of this case that Puerto Rico's options are set in stone. We don't think that they're set in stone. We just think that right now Puerto Rico is a territory of the United States, and as a result it's not a separate sovereign under the Double Jeopardy Clause. And just to give the Court the three data points where the Court has said we're going to focus on sovereignty under the Constitution and we're not going to focus on autonomy or level of control, you have the Puerto Rico v. Shell case, which was where the Court said Puerto Rico already has autonomy, but they're still not a double jeopardy sovereign. You have Waller, which is about municipalities and the State of Florida trying to basically treat its municipalities as sovereign, and the Court said, no, no, no, you are not in the same relationship to your municipalities as the States are to the Federal Government. The municipalities are more like the territories. There's a different ultimate source of authority. And then the Court, with respect to the Indian tribes, said even though Congress has the ability to legislate for the tribes, they still have this inherent source of authority that predated the Constitution and was recognized in the Constitution. So for the Court to turn away from that, we think, would really upend that precedent, and not for good reason, because I think I'd like to conclude, if I can, where I started, which is this power, this dual sovereignty power, is a weighty power that the Court has reserved for those entities that have the ultimate power under our Constitution, defined in our Constitution. And for that reason, Puerto Rico, despite its significant self-government, is not a sovereign under the Constitution. Roberts. Thank you, counsel. Four minutes, Mr. Landau. Landau, thank you, Mr. Chief Justice. If I could very briefly just say, there's two real questions here, as the questioning has brought out. First, what happened in 1950 to 1952, and, B, if so, is that constitutional? There is no question, if you look at the documents of 1950 to 1952, that Congress required Puerto Rico to have a Republican form of government, which is a government by the people of the people. This was understood at the time to be a new experiment. This was not just another organic act. And the Constitution of Puerto Rico, which was approved by Congress and the President, says the power, the political power of the Commonwealth emanates from the people, and Congress recognized that. Okay. So that goes to the what happened. Then you go to the real meat of the case, which is the constitutional argument. It is shocking that the Respondents and the United States government in this case are using the territorial clause as a restriction on power, a limitation on power of government. This is so ironic, for exactly what Justice Breyer was saying, that as the insular cases, if they stand for anything, mean that Congress has plenary control over the territories. That means that Congress can come up with inventive solutions which are broader than the only menu that they give, which is a colony governed pursuant to direct or delegated Federal power, statehood, or independence. Where do they get this view that you can't come up with something inventive like the Commonwealth or the Estado Libre Asociado, as Justice Breyer said? This is the genius of our system, that it allows us to have these unincorporated territories. Sotomayor, would you explain what Estado Libre Asociado means in Spanish? It means free associated state, literally. And again, I think it is an assoc — it has the concept of free, and it has the concept of associated, and state, and Estado. Do you know why they didn't use that phrase in the compact with the United States? I think they thought that Commonwealth was the more natural English word, but I'm not sure, Your Honor. I believe, because I've seen the Act, that they didn't because states have a different meaning in the United States. And again, we are certainly not saying that we are a state. Again, that was the whole genius of the Commonwealth, that it allows flexibility by Congress to come up with these kind of creative solutions. And I think that's what it means. Sotomayor, solicitor general's office claims that Grafton says that when we are looking at Double Jeopardy, we are looking at something different. We are looking at territory versus State. Do you agree with that reading of the Shell case and of Grafton? I absolutely do not agree that Grafton said that in any and all contexts, regardless of what of any kind of territory, it is invariably going to have that political relationship. Grafton was describing the particular relationship there where the governor of Puerto Rico, of the Philippines, was appointed by the President. And he was just to finish that one point, Your Honor. Grafton, it's called Grafton versus United States because the Philippine prosecution was brought in the name of the United States. Shell is exactly the same thing. The Shell case said that was pursuant to an organic act. But things changed in the 50s, fundamentally, as I'm not just saying this. This Court recognized in the whole series of decisions in the 70s that there was a fundamental transformation and that Puerto Rico represents a very unique constitutional experiment in our history about how we have an unincorporated territory that exists in long-term association with the United States, but being the creator of its own government, which was very important to the people of the government. If there's one thing you read, please, in our reply brief, read that Frankfurter memo, because he, as the law officer in the Department of War, addressed exactly this issue. And please do not take the Constitution of Puerto Rico away from the people of Puerto Rico. Roberts. Thank you, counsel. The case is submitted.